IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


PATRICIA WOLFE,

                Plaintiff,                           07cv0254

                                                  **ELECTRONICALLY FILED**

     v.

CENTRAL BLOOD BANK OF PITTSBURGH,
ITXM CENTRAL BLOOD BANK, SERVICE
EMPLOYEES INTERNATIONAL UNION
DISTRICT 1199P, CAROL DOLLISH,
SAMUAL WILLIAMS,

                Defendants.


**<u>Memorandum Opinion</u>**


       This is an action for employment discrimination.  Plaintiff, Patricia Wolfe ("Wolfe")

alleges that defendants, Central Blood Bank of Pittsburgh, ("CBB"), Service Employees

International Union District 1199P ("the Union"), and Carol Dollish ("Dollish") discriminated

against her on the basis of age and gender, that she was sexually harassed, and that she was

terminated in retaliation for her complaints of alleged sexual harassment, all in violation of the

Age Discrimination in Employment Act (ADEA), Title VII of the Civil Rights Act of 1964, and

the Pennsylvania Human Relations Act (PHRA).[1]  Pending before this Court are defendants'

motions for summary judgment (doc. nos. 47 and 49).  After careful consideration, and for the

reasons that follow, this Court will GRANT defendants' motions for summary judgment.

_____

       [1]Pursuant to a stipulation by the parties, all claims against former defendant Williams
have been voluntarily dismissed with prejudice.  (Doc. No. 28).

I.      **Facts**

The parties have set forth more than 50 pages of material facts.  The facts may be fairly summarized as follows.[2]  Plaintiff, who is a 51 year old woman, was hired by defendant CBB in October 1989 as a Laboratory Technician I ("Lab Tech I").  In approximately 1993, she was promoted to Laboratory Technician II ("Lab Tech II") and she was promoted to position of Trainer in 2002.  She subsequently self-demoted herself back to the position of Lab Tech II because she did not like the hours she had to work as a Trainer.  At the time of her discharge, she was a Lab Tech II.

        **Grievance Procedures/Policies Against Harassment**

Since at least 2003, the terms and conditions of plaintiff's employment were covered by a Collective Bargaining Agreement between the Union and the CBB.  Plaintiff served as a Union Steward from 2004 until her termination on March 22, 2006.  As a Union member, plaintiff could file a grievance under the grievance procedure if she had any complaint against a supervisor.

Both the CBB and the Union have comprehensive policies against harassment.  The CBB policy against harassment specifically provides that if an employee feels that he or she is being harassed or retaliated against, he or she should contact the Site Human Resources representative. The CBB also has a policy against Sexual Harassment and similarly provides employees with a

_____

[2]The Court notes that in her responsive concise statement of material facts, plaintiff never once cited to the record to support her allegations, which violates LR 56.1, which states in pertinent part: "A party must cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record supporting the party's statement, acceptance, or denial of the material fact."  This failure to follow the Court's rules has made it very difficult for the Court to determine which facts are genuinely in dispute, and which are not.

complaint procedure (including a confidential hotline).  Plaintiff received copies of both the

Harassment Policy and the Sexual Harassment Policy and received training on both policies.

### **Plaintiff's Job Responsibilities and CBB's Guidelines for Discipline**

Lab Tech IIs are responsible for manufacturing and modifying blood and blood

components intended for transfusions in accordance with the manufacturing practices required by

the FDA, and the CBB.  Plaintiff, as a Lab Tech II, has many responsibilities including

centrifuging blood products, precisely entering blood products which have been entered into the

computer system, and eventually weighing the products and ensuring that they are sufficient

weight.

Because the CBB employees must be extremely careful and consistent when processing

blood products, the CBB has developed very specific standard operating procedures and strict

Guidelines for Progressive Discipline for employees who fail to follow a standard operating

procedure.  The Guidelines for Progressive Discipline identify two types of errors: Class 1 and

Class 2.  A Class 1 error has the potential to affect the safety, potency, purity or identity of the

blood products or the potential to adversely impact patient care.  According to the Guidelines for

Progressive Discipline, an employee who commits a Class 1 error is subject to progressive

discipline on a rolling 12 month calendar beginning with a written warning on the first error and

termination on the third error.  Plaintiff, however, states that she "has no knowledge of

terminations following three Class 1 errors in a rolling 12 month period."  (Doc. No. 67 at 8).

Class 2 errors do not have the potential to affect the safety of the product, and therefore, the

Progressive Discipline is much less severe.

**<u>Plaintiff's Discharge</u>**

Plaintiff was discharged for committing six (6) Class 1 errors within a 12 month period, four (4) of which occurred within an 8-day time frame.

Specifically, on November 3, 2004, plaintiff received a Corrective Action Notice for allegedly mislabeling two fresh frozen plasma products and a supervisor issued a Corrective Action Notice.  Plaintiff did not file a grievance through the Union.

On June 15, 2005, plaintiff received another Corrective Action Notice and suspension for allegedly failing to apply labels to certain products.  Plaintiff was suspended for this error because it was her second Class 1 error in a 12 month period.  Although plaintiff now alleges that computer problems caused the errors, she did not file a grievance over this notice.

Next, on November 9, 2005, plaintiff received yet another a Corrective Action Notice for not following the standard operating procedure on sealing of a blood product.  This was a Class 1 error and plaintiff was suspended for one day.  Although plaintiff contends that she was singled out for improperly sealing the products, she neither denies that the seals were broken by her, nor did she file a grievance.

Finally, on March 8, 2006, March 14, 2006, March 15, 2006, and March 16, 2006, plaintiff committed four more Class 1 errors.  In her responsive statement of facts, plaintiff does not deny that she made these errors, she simply makes excuses for her conduct and states that the errors "were manufactured against her."  Doc. No. 67 at 16.  She cites to no record evidence, however, to support her position.

Because she had now committed six (6) Class 1 errors, CBB representatives (including defendant Dollish) made the decision to discharge plaintiff.  Once plaintiff was informed from a

4

coworker that her employment would be terminated, plaintiff began photocopying alleged errors of other employees and she brought these photocopies to her supervisors.  However, there is no evidence to demonstrate that these alleged errors were similar errors in kind or in degree.

### Plaintiff's Romantic Relationship with Rodgers and Conflict with Defendant Dollish

Plaintiff alleges that defendant Dollish ("Dollish") (a woman and plaintiff's supervisor) discriminated against her and harassed her because plaintiff had a consensual romantic relationship with Darrell Rodgers ("Rogers"), a Quality Control Technologist at CBB. According to plaintiff, Dollish also had a romantic interest in Rodgers and plaintiff has presented some facts supporting her belief that Dollish and Rodgers also had sexual relations.  (Doc. No. 64, declaration of Elaine Elko).

Plaintiff, who had been married to Roy Wolfe since June 1997, began a sexual relationship with Rogers on September 18, 2003.  The relationship did not end until October 2006 - more than six (6) months after plaintiff's employment with CBB was terminated, and plaintiff never tried to end her relationship with Rodgers prior to that date.  Plaintiff and Rodgers (who was a known drug user) got an apartment together in September 2004; Rodgers gave plaintiff presents; they took vacations together and they spent time with each other's families. While plaintiff was a Union Steward, she had Rodgers accompany her to an out-of-town Union conference and paid for him to stay in her room.

Plaintiff, who was born on April 9, 1956, alleges that Dollish, who was approximately 2 years older than plaintiff, discriminated against her because of her age.

Plaintiff also alleges that she was discriminated against by Dollish in that she was disciplined for making errors and for wearing Capri pants to work on September 8, 2005, despite

the known fact that there was a dress code requiring all exposed skin to be covered. On prior

occasions, Dollish spoke with plaintiff about wearing inappropriate clothing, including an

incident in late August 2005, where plaintiff was reprimanded for wearing Capri pants in the lab.

As a result of plaintiff's wearing Capri pants to work on September 8, 2005 (and being

reported by a Ms. Paterson, who was also a supervisor), plaintiff received a Corrective Action

Notice recording a verbal warning.  According to plaintiff, other women in the lab also wore

Capri pants, yet plaintiff was the only employee who received a warning.  Defendant contends

that other supervisors (including Ms. Paterson) at CBB stated that they did not notice any of

these women wearing Capri pants.  (Doc. No. 67 at 25).

The facts surrounding plaintiff's allegations of harassment/hostile work environment are

as follows: she alleges that between August 2004, when Dollish learned of her relationship with

Rodgers, and March 2006, when plaintiff was discharged, plaintiff witnessed Dollish rub up

against Rodgers on one occasion; she witnessed Dollish touch Rodgers arm, back or head on five

or six occasions; Dollish asked plaintiff personal questions about how her son and husband were

doing; Dollish looked at plaintiff from "head to toe"; Dollish would take smoke breaks at the

same time as plaintiff and Rodgers; and she alleges that she heard Dollish state that if she were

giving Rodgers oral gratification, he would be happier.

Plaintiff repeatedly testified during her deposition that Dollish did not treat her any

differently because of her sex or gender or age, and that none of the alleged acts of harassment

were because of her sex or age.  (Doc. No. 67 at 27-29).  Plaintiff now claims, without citing to

any record evidence supporting her assertion, that "she has a hostile work environment because

of the predatory practices of Mr. Rodgers acting ion [sic] the capacity of plaintiffs' supervisor."

(Doc. No. 67 at 27).

After reading the numerous citations to the deposition of plaintiff, plaintiff (at least before consulting with her attorney) testified that Dollish treated her differently because she was involved with Rodgers, not because she was a woman and not because of her age.  After a recess in the deposition, plaintiff's testimony changed and she later stated that she believed that she was being treated differently because she was a woman having an affair with a man and that her age was a factor.  According to plaintiff, any conversations with her attorney are "strictly confidential" and plaintiff had a right to change her answers after she was out of the deposition room.  (Doc. No. 65 at 4).[3]

Regardless of her deposition testimony, plaintiff never formally complained to anyone in Management or Human Resources about either the alleged harassment of Rodgers by Dollish or about the alleged harassment of plaintiff by Rodgers.  Again, without citing to any evidence of record, plaintiff now claims that she told Supervisors Mroczowski and Morris and that she also her paramour Rodgers to ask Dollish to "stop the harassment."  (Doc. No. 67 at 31).

Plaintiff alleges, without citing any record evidence, that she complained to three Union Stewards about Dollish on numerous occasions but plaintiff never asked the Union to file a grievance on her behalf regarding this alleged harassment of Rodgers by Dollish.

Concerning the alleged "harassment" by her paramour Rodgers, plaintiff further makes conclusory statements that:

> When Plaintiff became involved with him, he was so good at the sexual

---

[3]While the Court does not attempt to characterize the motives or reasons for her change in testimony, the Court merely notes that it remains an undisputed fact that plaintiff's testimony changed after a recess.

> harassment, Plaintiff gave Mr. Rodgers money, paid for his apartment,
> bought him clothes, jewelry, food, toiletries and essentials for the apartment,
> took him to lunch, dinner, paid for vacations.

(Doc. No. 67 at 36).

Again, without citing any evidence of record, plaintiff now attempts to justify her relationship with Rodgers by stating that she was vulnerable, that somehow this relationship was not consensual, and that she was "in a dream world feeling protected by a supervisor after losing family members, etc. in her life."  (Doc. No. 67 at 35).

### The Union Grievance

On March 22, 2006, plaintiff was summoned by the CBB to a meeting.  Present were several management representatives along with Union Stewards, Linda Graham and Ruth Thomas.  Plaintiff was given a copy of her termination notice outlining the infractions she had committed.  At the meeting, plaintiff expressed displeasure that she was being terminated for a series of mistakes which had occurred over a period of time, but that she had not been alerted to them at the time they occurred.  The Union Stewards took notes at this meeting while plaintiff did not.  As a result of this meeting, plaintiff might have stated something along the lines that "this is because of my relationship with Darrell," but she did not state that there was any animosity.  (Doc. No. 68 at 3).  When plaintiff was deposed, she stated that she never asked the Union to file a grievance charging any form of harassment or discrimination.[4]

Immediately after the meeting, Union Steward Linda Graham filed a grievance at plaintiff's request.  After conducting a several month long investigation, the Union determined

---

[4]In her responsive statement of facts as to the Union, plaintiff now attempts to "rescind" her testimony on this point.

8

that it did not have a basis to bring this Grievance to arbitration.

Plaintiff filed a charge of discrimination with the EEOC on September 4, 2006, and on November 29, 2006, the EEOC issued a Dismissal and Notice of Rights to Plaintiff.  Plaintiff filed this action on February 27, 2007.

## II.   Standard of Review

Summary judgment under Fed.R.Civ.P. 56© is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Woodside v. School Dist. of Philadelphia Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir. 2001), *quoting Foehl v. United States*, 238 F.3d 474, 477 (3d Cir.2001) (citations omitted).  In deciding a summary judgment motion, the court must "view the evidence ... through the prism of the substantive evidentiary burden" to determine "whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of the evidence required by the governing law or that he did not." *Anderson v. Consolidated Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' -- that is, pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993). Thus the non-moving party cannot rest on the pleadings, but instead must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), and cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (*citing Celotex*, 477 U.S. at 325 (1986)). The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F. 3d 639, 643 n. 3 (3d Cir. 1998), *quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir. 1994).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)." *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004.) *See also Doe v. County of Centre, PA*, 242 F.3d 437, 446 (3d Cir. 2001) (court must view facts in the light most favorable, draw all reasonable inferences, and resolve all doubts, in favor of the nonmoving party ).

## III.   Discussion

In analyzing claims for discrimination/retaliation under the ADEA, Title VII, and the PHRA, we apply the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this scheme: (1) plaintiff bears the burden of establishing a prima facie case of discrimination; (2) the burden of production then shifts to defendant to

articulate a legitimate, nondiscriminatory reason for the adverse employment action; (3) if defendant meets its burden of production, plaintiff must prove by a preponderance of the evidence that defendant's proffered reason was a pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-508 (1993).

To establish a prima facie case of age discrimination, plaintiff must show that: (1) she is forty or older; (2) she is qualified for the position in question; (3) she suffered an adverse employment decision; and (4) she was replaced by a sufficiently young person or sufficiently younger persons were treated more favorably so as to create an inference of discrimination. *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995); *Berndt v. Kaiser Aluminum & Chem. Sales, Inc.*, 789 F.2d 253, 257 (3d Cir. 1986)(citing *Massarsky v. General Motors Corp.*, 706 F.2d 111, 118 (3d Cir. 1983)).

To establish a prima facie case of gender discrimination, plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for her position; and (3) she suffered an adverse employment action or was discharged "under conditions that give rise to an inference of unlawful discrimination." *Geraci v. Moddy-Tottrup, Int'l Inc.*, 82 F.3d 578, 580 (3d Cir. 1996)(quoting *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

To establish a prima facie case of retaliation, plaintiff must demonstrate that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia, et al.*, — F.3d — , 2006 WL 2492256 (3d Cir. 2006)(quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

Even when viewing the facts in the light most favorable to plaintiff, plaintiff has not set

11

forth one scintilla of evidence establishing a prima facie case of gender discrimination, age discrimination, or that she was retaliated against for engaging in some protected activity. According to plaintiff, the acts of discrimination she faced were being issued a verbal warning for wearing Capri pants and being discharged for making six (6) Class 1 errors.  Since all other persons who allegedly wore Capri pants and allegedly were not reprimanded were also women, it is unclear how this alleged "discrimination" could be based upon plaintiff's gender.  As for plaintiff's claims with respect to being discharged for making six (6) Class 1 errors, plaintiff has pointed to no other employee, let alone a similarly-situated employee outside her alleged protected groups (female and over 40 years of age) who committed three or more Class 1 errors and was not discharged.

Moreover, CBB has proffered legitimate, nondiscriminatory reason for plaintiff's discharge - - that plaintiff's committed six (6) class 1 errors in a 12 month period and that anything over three (3) Class 1 errors would entitle CBB to terminate her employment.  *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)(citing *McDonnell Douglas*, 411 U.S. at 802).

Thus, under the final prong of the *McDonnell Douglas* analysis, the burden shifts to plaintiff to produce sufficient evidence to withstand summary judgment on the issue of pretext. *See McDonnell Douglas*, 411 U.S. at 802.  Plaintiffs must point to some evidence, direct or circumstantial, from which a fact-finder could reasonably either (1) disbelieve defendant's articulated legitimate reasons or (2) believe than an invidious discriminatory reason was more likely than not a motivating or determinative cause of defendant's action.  *See Fuentes*, 32 F.3d at 764; *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 523 (3d Cir. 1992)(citation omitted).  In other words, plaintiff must demonstrate such "weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions" in defendant's proffered legitimate reasons such that a "reasonable fact-finder could rationally find them unworthy of credence and hence infer that the proffered nondiscriminatory reasons did not actually motivate" defendant's action. *Fuentes*, 32 F.3d at 764-765 (quoting *Ezold*, 983 F.2d at 531).  Another way to establish that discrimination was more likely than not a cause of the employer's action is to show that the employer has treated more favorably similarly situated persons without the protected class. *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998)(citing *Fuentes*, 32 F.3d at 765).

Plaintiff has failed to produce any specific evidence refuting the employer's articulated non-discriminatory reasons.  She has utterly failed to set forth any evidence of record to establish any inconsistencies in the employer's stated reasons, nor has she shown that the employer treated more favorably similarly situated persons outside of the protected class.  Without any evidentiary support, plaintiff simply seeks to shift responsibility for her numerous and admitted Class 1 errors by stating there were other problems (such as computer glitches) that caused her to make these errors.  Plaintiff has presented no evidence to bolster her claim that her termination was a pretext for discrimination, because she has not shown that she was discharged while other similarly situated non-protected employees were retained, that she was subject to discipline while other similarly-situated non-protected employees were not disciplined, or that defendant's stated reason for her termination was a sham.

Viewing the facts in the light most favorable to plaintiff, this Court finds that she has failed to establish sufficient evidence from which a reasonable fact-finder could rationally find that the defendant's articulated reasons for its employment action were unworthy of credence, or

that the decision to terminate her was the result of any discriminatory or retaliatory motive.

Where a plaintiff is unable to show weaknesses, implausibilities, inconsistencies, incoherencies,

or contradictions in defendant's reasons for its action, summary judgment is required. *See*

*Fuentes*, 32 F.3d at 756.

      Further, plaintiff's claim for harassment (hostile work environment) is similarly

unconvincing.  In order to establish a claim for hostile work environment, plaintiff must establish

that: (1) she suffered intentional discrimination because of her protected status; (2) the

discrimination was "pervasive and regular"; (3) she was adversely affected by the discrimination;

(4) the discrimination would adversely affect a reasonable person of the same protected status;

and (5) that respondeat superior liability applies. *See Kunin v. Sears Roebuck & Co*, 175 F.3d

289, 293 (3d Cir. 1999)(citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir.

1990)).  Further, the work environment must be shown to be objectively hostile or abusive and

the plaintiff must have perceived it as hostile or abusive.  *See Harris v. Forklift Sys., Inc.*, 510

U.S. 17, 22  (1993).  Courts must consider all of the circumstances, including, "the frequency of

the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance." *Harris*, 510 U.S. at 23.

      As rehearsed, plaintiff appears to be arguing that she was involved in what she now

describes as a non-consensual, yet intimate, relationship with Rodgers, and that the existence of

that personal and intimate long term relationship somehow translates into a viable sexual

harassment claim.  Plaintiff further appears to claim that because Dollish made alleged overtures

to Rodgers (which may or may not have been acted upon), that is tandem to a viable sexual

14

harassment claim for plaintiff.  At worst, Dollish's relationship with Rodgers could be described as unprofessional, but it does not rise to the level of an abusive hostile work environment, nor does it constitute sexual harassment to plaintiff.  If, in fact, Dollish and Rodgers engaged in a consensual sexual relationship outside of work, as plaintiff alleges, that fact has does nothing to bolster plaintiff's claim for a hostile *work* environment.  Likewise, the fact remains that plaintiff and Rodgers had a long term intimate relationship - - the mere fact that said relationship was cultivated at work does nothing to support her claims for harassment.  Furthermore, plaintiff has admitted that she never advised anyone in management or human resources that she believed that Rodgers, who was not her supervisor, was harassing her.  Therefore, the Court will not impute any liability for Rodgers actions (even if they did constitute harassment) to CBB.

Plaintiff's allegations do not rise to the level of an "objectively hostile or abusive" work environment, nor would a reasonable person of the same protected status be adversely affected. Moreover, plaintiff has failed to establish that these general allegations somehow demonstrate intentional discrimination on the basis of plaintiff's protected status (female/over 40).  All that plaintiff can show on the facts presented is that she, Rodgers and Dollish had developed what could be described as a "love triangle".  Though this situation was certainly unprofessional, plaintiff was a willing player in the "game" (as plaintiff regularly refers to it), and plaintiff has produced no evidence, other than her own conclusory allegations, that these actions, or any other alleged actions, constituted a hostile work environment.  For all these reasons, plaintiff's claims for "harassment"/hostile work environment fails.

Finally, in her brief in opposition to the Union's motion for summary judgment, plaintiff only alleges that "the Union did not listen to all of the facts plaintiff had to present regarding the

15

alleged errors." (Doc. No. 65 at 4). To the extent that plaintiff alleges a breach of the duty of fair representation against the Union, this claim fails because plaintiff has presented no evidence whatsoever that the Union pursued the grievance unreasonably or in bad faith. *See Vaca v. Sipes*, 386 U.S. 171, 190 (1967)(the duty of fair representation means an obligation to fairly represent each member of the bargaining unit by avoiding conduct that is "arbitrary, discriminatory, or in bad faith."). Furthermore, plaintiff has failed to set forth any evidence that the Union acted irrationally or unreasonably in its investigation. *See Airline Pilots Ass'n Int'l v. O'Neill,* 499 U.S. 65, 75 (1991), *quoting Ford Motor Co. v. Huffman*, 395 U.S. 330, 338 (1953)(If a union has acted "rationally" within a relative "wide range of reasonableness," its conduct will not be in violation of the duty of fair representation).

 Accordingly, for the reasons set forth hereinabove, defendants' motions for summary judgment (doc. nos. 47 and 49) will be granted.

 An appropriate order will follow.


s/Arthur J. Schwab _____
Arthur J. Schwab
United States District Judge

cc: All counsel of record